At the outset, I wanted to welcome you all to our court today. And Judge Carnton, I wanted to introduce to you and welcome again to our court Judge Kelly, who's kind enough to be sitting with us all week. He brings a world of experience and distinction to this task. He sat on the United States Court of Appeals for the Tenth Circuit, where he has been since 1992 when he was appointed by President Bush. So, Judge Kelly, we're delighted to have you with us and thank you for your labors on our behalf. Second observation, for those of you who may not be familiar with our timing and lighting system, you'll note that there's a time clock that will tell you how much time you've used and how much remains for you in your argument. And there are lights. There's a green light, which means, of course, that you can proceed. There's an amber or yellow light, which is a two-minute warning. And there's a red light indicating that your time is up. When that light goes on, we'd be much appreciative if you could bring your remarks to a conclusion. One of my colleagues years ago was fond of saying that the red light is not aspirational. And so we'd be much appreciative if you would be mindful of it. It doesn't mean you've got to stop in the middle of a sentence. But if you could bring your remarks to a close, we'd be much appreciative. Third and last, as you proceed with your arguments today, you can safely assume that we've had a chance to review the briefs, the materials in the case. In some instances, we've had a chance to read the record or much of the record as well. So feel free to go really to the heart of your argument. With that, we'll begin with the first case, which is the United States v. Stacey Waddell. Good morning, Your Honors. Good morning. Mr. Wardell had a property-based interest in the back end of his company's website. And the third-party consent rule does not extend to webmasters. No customary understanding exists that a webmaster cannot permit others to rummage through the back end of a private website. Webmasters do not have mutual use for most purposes of a customer's website. They have merely the ability to access it for upkeep, much like office custodial staff merely have the ability to access our office spaces for upkeep. And the Supreme Court has not extended the third-party consent rule to individuals that have the mere ability to access property. There's two lines of cases that, in my view, tease this out. On one hand, there's the co-tenant and shared user cases. So cases like Georgia v. Randolph, United States v. Thomas of this court, where two such that they both have the right to enjoy the property. And in that circumstance, courts have held third-party consent applies. On the other hand, there's a line of cases like the hotel operator and guest cases, the landlord-tenant cases, where one party has the mere ability to access property for a discrete purpose such as upkeep. And that line of cases is more like this scenario. Well, let's assume you're right about that. Let's assume that there was no right to consent by the administrator. What expectation of privacy did your client have in the corporation's computer? He's not the corporation. He was not the registered agent. What is that expectation? Yes, Your Honor. So I have two arguments for the expectation. First is a property-based, mirroring the Supreme Court's analysis in United States v. Byrd, where the court said that an individual can have a property interest in a rental car, even if they're not an authorized user, and so it's the corporation's property, the rental car company's property, and somebody else assigned onto it, if he has the right to exclude a possessory interest. And in this circumstance, Mr. Waddell had a possessory interest in the back end of that website. He could password protect it. He could exclude Ms. Peterson, the webmaster. And this is a situation where he's not merely an employee, but he is running the corporation. He was the CEO. And so he could sever the relationship with Ms. Peterson altogether and totally exclude her from the site. And so that type of possessory interest and right to exclude has been recognized as sufficient to support forthcoming... Did he have an interest that was in any way individualized and separate from the corporation's interest? Yes, Your Honor. And that's going to the Cass test a bit, and I believe he did because he generated some of the records personally in the back end of that site. They might have been owned by the corporation, but courts have recognized you can have a personal connection or... Of course, everything that a corporation is doing is done through real live people. And so every record created by and for a corporation is generated in that sense by an individual who may be an employee or the CEO or the president or the sole shareholder, which in this case, I take it your client is. Yes, Your Honor. The trouble I'm having is really the thrust, I think, of Judge Carnes' question. How do we tease out his interest from the interest of the corporation? So one case that I'd point to is United States v. Hensel from the Old Fifth, where a sole owner and corporate shareholder of a company's office was searched by the police without a warrant, similar to this case, and the court found that he had an interest distinct from the corporation because he frequented the office, he spent time in there, he personally generated some of the records, and it was private. He had an expectation that other individuals wouldn't invade that office outside of the corporation. Well, didn't he also have a lot of personal stuff on that? Yes, Your Honor. Whereas we don't have that in this case? That is correct. So the personal property element to this, I know the government has emphasized that point, but there's no ownership requirement in the Fourth Amendment. There just needs to be a nexus, a personal connection, and generating the files, frequenting the account, and locking it off to others, Your Honor, is sufficient to supply that nexus. One case I'd point to is Mancusi v. DeForte in the Supreme Court, Your Honor, where a union employee shared an office with several other employees, and the court found that he had an interest in the union records, but nowhere in the court's opinion did it discuss personal property. The focus was on that was his area that he frequented, his office, and he had an expectation that no non-union officials would invade that area. And so based on Mancusi and Hensel, the different factors the court can look to to discern a distinct expectation of privacy are generating the records, taking steps to exclude others, how much time he spends in the area. But to me, the property-based interest is pretty strong in this circumstance where I can understand in some situations where with employees who work for a company and they have IT administrators. Of course, the site is not owned by him, it's owned by the corporation. That's correct, Your Honor. And that distinguishes it from all of these other possessory interests, which might be less than fee simple in the property. So I've got an interest in a hotel room that I rent for a night. I've got an interest in a car that I rent from Avis for the night. But that's different from, it seems to me, the corporation's website, which is owned by the corporation, created for the benefit of the corporation. And everything apparently that's generated on that computer screen is corporate in nature rather than, as Judge Kelly says, there's anything personal. So that's where I'm having some difficulty discerning the reasonable expectation of privacy that society is willing to recognize. So Your Honor, another way to maybe look at this is, so in the United States v. Carpenter case a couple years ago, Chief Justice John Roberts noted that as technology is advancing, the role of the Fourth Amendment is to maintain the expectations of privacy that existed at the time of the framers. And at the time of the framers, this information on the back end of this site, the customer invoices, Mr. Waddell's correspondence with customers, would have been in his desk drawer in his office. And so simply because times have changed and now he has online accounts storing that information, doesn't erode or take away his privacy interest. And Justice Gorsuch even made this point in his dissent where he noted that that's why this property-based approach makes sense in the digital age because all of our online accounts for businesses, individuals, are stored on the cloud where individuals might have the ability to access it. And so if you have control over an account and a possessory interest in it, the ability to exclude others, you can have a proper Fourth Amendment interest. Well, do you have any cases that support sole control as the linchpin, if you will? United States v. Byrd, although it's involving a rental car, Your Honor. And that's- I mean, do you have any cases in this context? In the digital context, Your Honor? Yeah. No, sir. All right. But this idea of control, I believe that Mr. Waddell still would have had a possessory interest much like somebody who owns a rental car or who's been authorized to use the rental car because that individual, if they're sitting in the car, they can exclude others just like- They don't have a third person that is in charge of the car. In Byrd, Your Honor, the individual did not rent the car. He was an unauthorized user and yet the court still found that because he merely had the ability to control, he could have a Fourth Amendment claim or interest in that case. Your time is short, though, so it might be helpful if you moved on to some of the other issues. Okay. One in particular that would be of interest to me would be to address whether or not the government has established beyond a reasonable doubt all of the elements of the wire fraud in counts one and three. That is to say whether the wires that they alleged were, in fact, part and parcel of executing for the purpose of executing the scheme to defraud. So, Your Honor, I would say no, particularly on count one. The government's theory has been that the wire to the casino in count one furthered the scheme because it was necessary to provide Mr. Waddell control of the funds obtained, but before sending that wire, Mr. Waddell made a cash withdrawal from the bank. The individual wired the funds to the bank. Mr. Waddell made a cash withdrawal, so he had cash in hand, and then only later, a couple hours later, deposited in a new account and then sent the casino wire. And so, that cannot be seen, that second wire is necessary for him to gain control when he had cash in hand. Well, help me with the account itself. The wire transfer in count one is 22514. There's a wire transfer in the amount of $60,000 from an account in a corporate name Optimal Financial Group, Inc. at the First Georgia Coastal Bank to an account at the Seminole Hard Rock Hotel and Casino. Who had control over the Optimal Financial Group, Inc. account? Mr. Waddell had control over those accounts. Did anyone else have access to that account? One other individual was listed on that account. Who was that? I'm talking about the Optimal Financial Group, Inc. account at the First Bank of Coastal Georgia. There was either Courtney Jolly or one other individual, people that were employees of the companies. And I do not have the name off the top of my head. Only one or more than one? There was one listed on each account. The Optimal Financial Group account, it was Mr. Waddell and one other individual. Same with the South Carolina Bank and Trust account. So he didn't really necessarily have sole dominion and control over the account? Control is a fact-specific inquiry, Your Honor, and under the facts here, even the government has noted that when accounts were opened, even if other individuals were listed, power and control was turned over to Mr. Waddell. He was the only person making withdrawals. In the record, he made all the withdrawals from the account, save one time when Ms. Jolly made a withdrawal from one of the accounts. So which account did Jolly make a withdrawal from? The one on account one or account three? I'll have to look that up, Your Honor, and follow up with you. All right. Thank you. And so one last point I'd like to make is that if the court finds evidence insufficient for accounts one and three, under the sentencing package, Dr. Resentencing would be appropriate to make sure that the sentence reflects the scope of Mr. Waddell's criminal culpability. Take a moment or two and tell me, with regard to the sentencing, whether the district court made an appropriate finding as to the amount of the fraud. So Mr. Waddell made objections to all the witnesses, the alleged victims who did not offer trial testimony, and the government responded with no evidence, offered no evidence at the sentencing hearing. So we submit that the district court erred in finding that the government met its burden by a preponderance of the evidence for all those victims, and so the loss amount enhancement is inaccurate and requires remand. Thanks very much. Thank you, Your Honors. And you have reserved three minutes for rebuttal. You'll have that, the full rebuttal time. May it please the Court? Good morning, Your Honors. James Stuchel on behalf of the United States. The Court just engaged Mr. Waddell in a long discussion of his claimed privacy interest. I have to confess, I think the Court picked up all my points in my brief. I agree with everything the Court stated there. Just briefly, he did not have a privacy interest, independent of his status as a shareholder, because he had no personal connection to the matters. There's no evidence in the record of how much time he spent in the shopping cart portion of his website. All the material was generated automatically by the website when one of his victims ordered gold online and the system generated the receipt. He didn't have that personal connection. He also didn't attempt to keep it private. The evidence is undisputed that Heidi Peterson, whom he hired to design, create, administer, and host the website for a period of two years, including all the time in which he committed fraud, had unfettered access to every aspect of the website because of her administrative privileges. And in fact, in United States v. Ziegler, the Ninth Circuit has held that someone with administrative privileges can consent to a search of the computer. Ms. Peterson wasn't the only person who had administrative privileges. Waddell himself did. He tried to lock her out of the website a couple of times and then shared his own individual login and password with her and never changed it. There was a third person, employee Wanda Sharp, likewise had the same administrative privileges. So because two other people had complete access to the whole website, including the shopping cart, he did not make any efforts to keep it private. But even if he did have a privacy interest in the shopping cart portion of the website, the Secret Service's search was nevertheless entirely constitutional. That's because Ms. Peterson had at least apparent, and I believe also actual, authority to consent. Apparent authority exists when, given all the facts known to the police at the time, they would cause a reasonable person to believe that the third party had authority to consent. But doesn't there have to be a holding out by the person who is giving the implied consent? A holding out? Yes. In other words, if just because I have a password and say I can get you into that account, that does not necessarily give any apparent authority if Waddell did not facilitate that. No, I disagree, Your Honor. In United States v. Ziegler, the IT person in the corporation there had administrative privileges and the Ninth Circuit held that that allowed him or her to validly consent to the search of the website. So would you suggest then that a motel proprietor, because he had the keys to the room, could just go in and search the person's room? No, I wouldn't. Why is there a difference? There's a difference because there are actually two fundamental differences in this whole case. I mean, one, the corporation owned all the property, not Waddell. And two, this is not tangible property like a hotel room. This is information data in cyberspace on a website. Now, in a hotel, in addition, the Supreme Court's long held that residences hold special status for Fourth Amendment purposes. This website is not a residence. It's a commercial business. And again, it's a business of intangible property. So why did the Secret Service agent reasonably believe she had authority to consent? Let me review what he knew at the time. First, this whole thing started in November of 2014 when one of Waddell's victims came to Agent Rothschild and told him that he had been ripped off of $26,000 on Waddell's website. So he then began an investigation. He independently identified 30 other- But didn't the agent know that Peterson had access to the website basically through her administrative privileges? Yes. She told him exactly that. She told him that she had access, that she had designed, built, and maintained the website for two years with regular updates and that she had administrative privileges giving her her own unique login and password. She also told him that Waddell had the same administrative privileges. So he knew exactly what that authority conveyed to Ms. Peterson. Well, did he not know, the agent, that Waddell had unique login credentials and indeed eventually changed the password to the control panel? Ms. Peterson told him that Waddell had likewise administrative privileges. So they both had the same ability and authority to access every aspect of the website. Now, it is true that at some other point in time, he did change it. But it's not clear exactly when that happened. She did, Ms. Peterson did testify in- Right. But I guess what I'm focusing on is what she would have communicated to the agent in words or substance. Did she not tell the agent in words or substance that her access was because she was an administrator? She was there. She created the website and would tinker with it from time to time. But she didn't otherwise have access to make entries and debits and credits and so on and so forth, right? He knew that, didn't he? I disagree that she didn't have access. Remember, at the same time that she first approached the agent, the law enforcement, she gave them a printed out copy of one of the receipts from the shopping cart verifying the complaint so that there proved that she had access. She got that before she ever even talked to law enforcement. Remember, her suspicions arose when two of Waddell's victims independently contacted Ms. Peterson and complained and told her that the website was an absolute fraud. In any event, as I take it, your position is this is a secondary or fallback argument. Your view is that it's a corporate account for corporate purposes. He had nothing personal to do with it and he had no independent rights as a shareholder that transcended or were different in any way from the corporate interest. Exactly. That's the heart of your argument. That's the heart of my argument, Your Honor. Thank you. Take me to the counts one and three, the wire fraud. Yes. Let me focus you on what was bothering me and you can help me with it. If you had charged, for example, that the original wire, where Falkenberg wired his money to the FBCG account at Waddell's direction, there would be no doubt that that would be in the course of the in furtherance of this scheme or artifice to defraud. For reasons that are not clear to me, you didn't charge it that way. You charged the wire sort of at the back end of the transaction. That is to say, the victim of the fraud is induced to wire transfer some of money to a corporate account. He then goes into that account and he transfers the money to another account. And then ultimately, wire transfers the money from the second account to a Hard Rock casino account in his name. And you charge, as the guts of the wire transfer, the secondary transfer from the optimal financial group to an account at the Hard Rock hotel and casino. Why wasn't this fraud complete when the money was transferred into his account to begin with or when he otherwise took control of it, rather than in the back end when he decided to transfer some, most of the money to his gambling account? Yes, Your Honor. Initially, there's one slight modification. Mr. Waddell's scheme from the start was to never let a sucker off the hook. So he duped Mr. Falkenberg twice. He duped Mr. Falkenberg into making two independent orders of gold. The first was approximately $61,000. Mr. Falkenberg wired that money into the corporate account. It's true. We did not charge that particular one as one of the four wire cards. Why not? I don't know. But we did charge the second one. If you had, you wouldn't have the problem, would you? Your Honor, we— It would be a direct transfer of money for the purpose of swindling the guy out of $60,000 plus. That's correct. But count three did exactly that with regard to Falkenberg's second transaction. Help me with the first count. That's what we're talking about. Yes. Because you have multiple steps. Yes. And what you chose to zero in on as the key to the wire crime was the last of the transactions. Yes. We did that with regard to both of the instances in which Waddell ripped off Falkenberg. With regard to the first instance— Let me put it this way. Suppose he never transferred the money out of the first account. Would the crime have been complete at that point? You mean Mr. Waddell had never transferred it out of the first account? No. Falkenberg wire transfers $60,000 plus from his account to the corporate account at the direction of the swindler. And it goes into that corporate account. And there it sits. And it sits. And it sits. No, the crime would not be complete at that stage. And that's because we measure— He wouldn't have swindled the money and he wouldn't have used the wires to, in the words of the statute, executing the scheme or orifice? Look, that would have been a sufficient basis to convict him. In fact, we did convict him of exactly— So the crime would have been completed at that point. When the money went into the first account. The crime would have been— The scheme would not have been— Because as I said, Waddell's scheme was to never let a sucker off the hook. And he kept stringing Falkenberg on and on and getting him to invest more money. So yes, the individual crime, that count— How did it further the design to get Falkenberg to continue to spend more money, to throw good money, if you will, after bad, that on the first occasion Waddell simply withdrew from the corporate account and then from another corporate account $60,000, which he put in a casino account? How did that induce Falkenberg to do anything? Falkenberg was wholly unaware of anything that Waddell did with the money, right? Until later, that's right. At the time, he did not know. Yeah, he would not know, and he'd have no reason to know that Waddell took the money and ultimately earmarked it to pay off gambling debts. Yes, but respectfully, that's not the issue that Waddell has raised here. It's not whether the subsequent— Waddell's subsequent transfer to his personal account— Well, I think the issue that he has raised is whether or not you've proven beyond a reasonable doubt that the wire transfer described in Count 1 on 225.14 of $60,000 from an account of the Optimal Financial Group, Inc. at the First Bank of coastal Georgia to an account at the Seminole Hard Rock was taken for the purpose of executing the scheme or artifice to defraud. That's the heart of what he's alleging. Yes, and that transfer, as well as the other one that's at issue here, furthered Waddell's scheme in four ways. First, it got the money out of the corporate account over which Waddell had no exclusive legal right into his personal account. But who had control over that account besides Waddell? Did somebody else have control over that account? Yes, Your Honor, I discussed this in my brief. I don't think I put their names, but I looked it up subsequently in preparation. Their last names are McKinney and Vinson, V-I-N-S-O-N, two other employees of the corporation. They both had signature authority on the Optimal account. And so when the money was in there, Waddell had no exclusive legal right. He had rights insofar as he was a corporate officer. Does the record reflect that either McKinney or Vinson had ever drawn money out of those accounts? Yes, I believe it does. I can't point to the specific pages, but I know I saw the pages that they had signature authority over the account. And so Waddell needed to get it out of that account to get into his personal account to use it. That was part of his scheme that we alleged even in the indictment. I mean, I've cited six circuit court cases, all of which, if I may generalize for a moment, say that when money is initially, fraudulent money initially goes into an account over which even the defendant had access. As an individual, but he shared access with other people. So the problem is, I understand it from your perspective, is that he did not have unique and singular control over the account. That's correct. And that's supported by all the six circuit court cases I've cited. If I can quickly get to the second reason, is that it helped him further the fraud by avoiding detection. Remember, that's how in an earlier stage of the case, another one of his employees found out that he was a fraudster because she had seen the jury. Let me ask you, let's go back to the first one, though. I'm still not sure that I understand the argument because as I understand it at 2.49 p.m. that same day, Waddell personally withdraw $60,000 from that account at the Georgia Bank, thereby leaving only a remaining balance of $1,500. At that point, he had the sole control over $60,000, right? Not legal control because it was the corporate money. I'm talking about he had physical control over $60,000. Yes, which is not legal. McKinney, just try and help me. So just bear with me, please. I'm sorry. McKinney and Vincent had no control. They couldn't touch the money that was now in his hands, $60,000, right? Right. But that's irrelevant, Your Honor, because in all of the six other— I thought control was the heart of your argument. I thought your argument was that the fraud had not been completed on the front end because he shared control over this corporate account with two other people, McKinney and Vincent, and that therefore the courts and the law ought not to say that the crime was complete for the purpose of executing the scheme because others had access to it. So once he withdraws the money from the account himself, they have no control in a physical, literal sense over the money. What am I missing? I know I'm missing something here. What you're missing is the physical, literal sense is not the linchpin. That's established in the six circuit court cases that I've cited. In each of those cases, in the first account, the defendant had some access to it. In some of those cases, the defendant actually moved the money around. In one of the cases, the defendant actually used it to invest in another account. So, yes, the defendant— Let me ask you this question. Is there any indication, if the money is moved through a series of wire transfers for the purpose of concealment, there is no question that our case law suggests that that's more than enough to show that one of the purposes was to execute the scheme, that is to say, to lull and conceal. No. But is that the argument you're making here? That's the second way— Is that an argument you are making here? Yes. Yes, it is. Explain it to me if you would. That's the second way in which the transfer furthered the scheme because if Waddell had left the money in there, that would have made it possible for McKinney and Vinson to see all the activity and they would have grown suspicious. Now, unless you think I'm speculating, that's exactly what Deborah Sweet did with regard to another one of his phony corporations, Rare Southern Energy— That's why I said to you, once it comes into my hands personally, I make the withdrawal of the cash. At that point, these other folks have no access and no control over the money. Why isn't it complete at that point? Because he had no legal right. That was the corporate cash. He didn't have exclusive individual right, which is what the Sixth Circuit cases I've cited established. Again, in each of those cases, it's undisputed that the defendant had some authority over the money when it was in the first account. But the problem there was that other people had authority over the money too. And so, therefore, it was necessary for the defendant to make the subsequent wire to his own personal account. Let me draw out the hypothetical. I rip you off to the tune of a hundred grand. I say, I'm going to send you a cold billion. Just give me a hundred thousand. You say, terrific. You look like an honest guy, Marcus. And you wire transfer a hundred thousand dollars to me. I put it in my corporate account. And it sits in that corporate account for four years. I don't do anything with it. Other people have access to it. Four years later, I take the money out of the account in cash. And I give it to my son. He needs the money. He's going to school. It'll cover his tuition. And then my son, in turn, deposits it in his checking account. And my son wire transfers it to the University of Michigan to cover his college expenses. And you cite the wire transfer by my son to the University of Michigan. Was that for the purpose of executing the scheme? To defraud? No. That would go too far. Yes. Where's the difference? The difference is that in your hypothetical, you said I initially put the money in your personal account. So that would mean you had complete authority over it at that stage. And a subsequent transfer would not have furthered the scheme. But Waddell's is totally different, as I'm trying to explain. He did not have legal, exclusive, personal authority over the money when it was in the corporate account. He didn't get that until he wired it to the Hard Rock casino where he could spend it. But your theory is he didn't have lawful control over the money at any point. The money wasn't his. No. Once it was in his account, then he, no one else had control over his personal account at the casino in Florida. I think we've got it. Thank you very much. So piggybacking on to that point about wire fraud, Your Honors, there's no case law that says control turns on legal, exclusive, personal control. The government didn't cite any Sixth Circuit cases in its brief. And the cases it did cite from out of circuit talk about usable form. When the money's in a usable form to the defendant, the defendant then has control and subsequent wires cannot be attached. The federal wire fraud statute does not reach those wires. If this legal rule was the rule, as Judge Marcus pointed out, the scheme would never end because it was stolen money. And so the defendant never has legal authority over it. Why wasn't it still in furtherance of the scheme? It was not in furtherance because it did not advance the scheme in any way. It totally made the money unrecoverable. In other words, if it was still in the corporate account and he had discovered what was going on, he might have been able to get it back out. But because it was transferred to a personal account, that certainly seems to me that it was in his own pocket where he could spend it on whatever he wanted without anybody knowing anything about it. Well, Your Honor, for count one, he already had it in his pocket and could have disposed of it in any way. The fact that he decided to redeposit a bank and then send it to a casino doesn't make the subsequent wire necessary to dispose of the money or make it unrecoverable. But doesn't it further the scheme? I don't think it furthers the scheme, Your Honor. A legal question or a factual issue? I'd say that that is a legal question. Well, what was what was the scheme? Let's start with that. So the scheme is a consumer fraud scheme where Mr. Waddell advertised gold and silver at discount prices on the Internet, induced people to wire him money with no intention of ever sending them the gold and just pocketing the money and using it. And he actually used it directly from his account. The mere fact that he transferred money to a casino, he used that fraudulently obtained funds to go to a casino and spend it. And so once it was in the account, he had it in a usable form and sending it to a casino didn't conceal it in any way. That actually would raise red flags if you're sending money from a corporate account to a personal account. And the money, any way he spent it, it would have made it unrecoverable or withdrawn it from the account altogether. Into his hands, out of the corporate account. And that's what you do with count one, your honor. He had cash. Right. And count one, it's true that he takes the money out of the corporate account in cash. And then physically deposited it to a second account. So your argument is he had control, at least by that point. Yes, your point that he took it out in cash, he could have done anything with it. He could have paid his bills. He could have bought a car. He chose to use it to pay off his gambling debts. Count three, though, that doesn't happen. It really does zero down on the point that Judge Kelly is making. In count three, the money goes from the corporate account, ultimately gets wire transferred to the casino account. And with the government's argument being solely about control, I'd argue that he had in usable form. It didn't advance the scheme in any way to send it. Um, any wire made years later to to spend or use that money then could be attacked, tacked onto a charge like this when the government could have just charged money laundering or sending stolen funds. The wire fraud isn't meant to reach this broadly. This statute encompass using money from the account for personal uses. And I'd like to circle back briefly to the Fourth Amendment issue with the website. One case, Your Honor, Judge Kelly does involve the use of corporate property or electronic corporate property, and that's United States v. Nagel and the Third Circuit, which the government had relied on. There, the court put forward a two prong test. The defendant had information stored on a shared network for his business, and the court said, well, he could have a personalized interest in that information if he had a personal connection to it, which he did because there are files that he generated. And if he had taken steps to shield it from others. And here you have both of those prongs met. He had a personal connection that he generated the information and it was his. And he also took steps to shield it from others by password protecting it. And I discuss Nagel in our reply brief. And if there's any more questions that that's all I have. Well, I have one other question. With respect to the loss that was used, did you concede in your objections to the PSR that your loss, that the loss amount was between $250,000 and $550,000? No, Your Honor. At that point, at the sentencing stage, Mr. Waddell had terminated his counsel. And so he's representing himself. Standby counsel filed objections stating that the loss amount was in that range. Mr. Waddell disputed that. And so our contention is Mr. Waddell's authority trumps in that situation because he had the right to defend himself when there's a dispute with counsel. Thank you. I actually have one more point just to respond to Judge Marcus's question. The account, turning back to the wire fraud, the government has said that there's instances of Ms. McKinney making withdrawals from the accountant that was at issue in count one. There's no evidence of that. The only withdrawal made was one time by Ms. Vinson from count three. And I have record sites for that. If the court looks at, so trial exhibit 11-RF1A at 8 to 9 is the account information for the optimal financial group account in count one. And the transcripts get into the count of bid in the low 400s. I think we've got it. And I think we have your case. We thank you for your efforts. We thank you as well on behalf of the United States. I noticed, counsel, that you were court appointed. We very much appreciate you taking on the burden of representing your client. We'll proceed with the next case, United States v. Harris. Thank you.